CARL A. WESCOTT
8210 E. Via de la Escuela
Scottsdale, AZ 85258
*in propria persona*
CARLWSOJ@GMAIL.COM
+1 936 937 2688

**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

CARL A. WESCOTT,

Plaintiff,

vs.

MR. ROGER M. POLLOCK;

Defendants.

+ DOES 1 through 10

Civil Action No. 3:23-cv-145 YY

**PLAINTIFF'S VERIFIED LEGAL COMPLAINT FOR BREACH OF CONTRACT**

Plaintiff Carl A. Wescott, proceeding *pro se,* and using the assigned legal claims of his LLC (Callister LLC, dba Capital Ideas, Exhibit A) complains of Defendant Mr. Roger M. Pollock, and in support of his complaint, the Plaintiff states as follows.

**The Parties: Plaintiff and Defendants**

1. Carl Wescott is an individual presently residing in Scottsdale, Arizona.
2. Capital Ideas is a DBA for an Arizona single-member LLC (Callister LLC). Capital Ideas is the party that was in contract with Mr. Pollock. Capital Ideas assigned its related legal claims to Carl Wescott (Exhibit A).

3. To differentiate between Carl Wescott, the Plaintiff with the assigned legal claims of legal person Capital Ideas, and Carl Wescott, the individual, "Carl Wescott" shall refer to the natural person Carl Wescott.

4. Defendant Mr. Roger M. Pollock ("Pollock") is an individual who resides in Portland, Oregon.

5. Collectively, the Plaintiff and Pollock are "the Parties."

**Allegations regarding conspiracy between defendants**

6. Plaintiff is Informed and believes and thereon alleges that at all times material to this Complaint, Mr. Roger Pollock, as an individual, in addition to acting for himself and on his own behalf individually, as well as for the benefit of his marital community (if any), is and was acting as the agent, servant, employee, and/or representative of, and with the knowledge, consent, and permission of, and in conspiracy with, each and all of the other Defendants (individual and entities) and within the course, scope, and authority of that agency, service, employment, representation, and conspiracy.

7. Plaintiff further alleges on information and belief that the acts of each of the Defendants were fully ratified by each and all of the other Defendants. Specifically, and without limitation, Plaintiff alleges on information and belief that the tortious actions, failures to act, breaches, and negligence alleged herein and attributed to one or more of the specific Defendants were approved, ratified, and/or done with the cooperation and knowledge of each and in conspiracy with all other Defendants (individual and corporate, including Synergicity Inc.).

8. In addition, upon information and belief, there are nefarious corporate, trust, and other entity type Defendants involved in these conspiracies, currently unknown to Plaintiff. They shall emerge with the benefit of legal discovery.

9. Plaintiff is informed and believes and thereon alleges that at all times material to this Complaint, any and all such corporate entities, in addition to acting for itself and for its own behalf, was acting as the agent, servant, and/or representative of, and with the knowledge, consent, and permission of, and in conspiracy with, each and all of the Defendants (entity and individual) and within the course, scope, and authority of that agency, service, employment, representation, and conspiracy.

10. Plaintiff further alleges on information and belief that the acts of each of the Defendants were fully ratified by each and all of the Defendants. Specifically, and without limitation, Plaintiff alleges on information and belief that the tortious actions, failures to act, breaches, and negligence alleged herein and attributed to one or more of the specific Defendants were approved, ratified, and/or done with the cooperation and knowledge of each and in conspiracy with all other Defendants (individual and corporate).

**Jurisdiction and Venue**

11. Mr. Roger Pollock lives and works in Portland, Oregon. Thus, this Court is the appropriate venue for adjudication of the parties' issues.

12. This is an action for damages pursuant to 28 U.S.C. § 1332 based on diversity of citizenship and a claim for damages greater than US $75,000. Alleged damages are explained in further detail below as they are critical to this Court establishing subject-matter jurisdiction.

13. Supplemental jurisdiction over the Plaintiff's state law claims is pursuant to 28 U.S.C. § 1367 and the facts that the individual defendant lives and works in this district, the entity defendant is domiciled herein, and the tortious acts, non-acts, and negligence complained of herein occurred in this district, too.

**Subject-Matter Jurisdiction – Background and Legal Standards**

14. With damages of $75,000 and the diversity of citizenship of Plaintiff and Defendants, the Plaintiff would qualify for United States District Court under 28 U.S. Code § 1332(a)(1):

> DIVERSITY OF CITIZENSHIP; AMOUNT IN CONTROVERSY; COSTS
>
> **(a)**The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between—
>
> **(1)** citizens of different States; *(28 U.S. Code § 1332 (a)(1))*

15. The Plaintiff resides in Arizona and the two Defendants are citizens of California.

16. Thus, the parties have complete diversity of citizenship.

17. The Plaintiff will add the facts, logic, and reasoning supporting the Plaintiff's thinking that his recoverable damages will be greater than US $75,000.

18. To qualify for federal court under complete diversity of citizenship, the amount in controversy must exceed the sum or value of $75,000, exclusive of interest and costs (*28 U.S.C. § 1332(a) (2014)*).

19. The determination of the amount in controversy for federal subject matter jurisdiction is an issue decided under federal law. 14AA FEDERAL PRACTICE AND PROCEDURE § 3702 (4th ed.

2014) [hereinafter "FEDERAL PRACTICE"]. See *Horton v. Liberty Mut. Ins. Co.*, 367 U.S. 348, 352 (1961).

20. Federal courts will, however, look to applicable state law to determine the nature of the plaintiff's substantive claim and related damages. FEDERAL PRACTICE § 3702. See *Horton*, 367 U.S. at 352-353.

21. Numerous courts, including the United States Supreme Court have held that the amount in controversy for jurisdictional purposes is measured by the direct pecuniary value of the right that the plaintiff seeks to enforce or the value of the object that is the subject matter of the suit. FEDERAL PRACTICE § 3702.5. See *Hunt v. Washington State Apple Advertising Com'n*, 432 U.S. 333, 97 S.Ct. 2434, 53 L. Ed. 1067 (1947).

22. The direct pecuniary value of the right is simply an estimate of the total amount in dispute rather than an assessment of liability. *Lewis v. Verizon Communications, Inc*., 627 F.3d 395, 400 (9th Cir. 2010).

23. The amount in controversy is determined without considering accrued or accruing interest or the costs associated with the lawsuit. (*28 U.S.C. § 1332(b)*)

24. Courts have held that collateral effects will not be taken into account when calculating the amount in controversy. FEDERAL PRACTICE § 3702.5. See *Healy v. Ratta*, 292 U.S. 263, 267 (1934) ("the collateral effects of the decree, by virtue of stare decisis, upon other and distinct controversies, may not be considered in ascertaining whether the jurisdictional amount is involved, even though their decision turns on the same question of law."). See also *New England Mortg. Sec. Co. v. Gay*, 145 U.S. 123, 130 (1892) ("It is well settled in this court that, when our jurisdiction depends upon the amount in controversy, it is determined by the amount involved in

the particular case, and not by any contingent loss either one of the parties may sustain by the probative effect of the judgment, however certain it may be that such loss will occur.").

25. The amount in controversy may include compensatory damages including general and special damages such as pain and suffering and out of pocket loss. The amount in controversy may also include punitive damages. *Anthony v. Security Pac. Fin. Servs., Inc.*, 75 F.3d 311, 315 (7th Cir. 1996); *Watson v. Blankinship*, 20 F.3d 383, 386-387 (10th Cir. 1994).

26. When there is direct legal authority, by statute or contract, for the recovery of attorneys' fees, then the fee claim may be included in determining the amount in controversy regardless of whether the award of fees is mandatory or discretionary. *Galt G/S v. JSS Scandinavia*, 142 F.3d 1150, 155-1156 (9th Cir. 1998).

**Subject-Matter Jurisdiction with the Alleged Facts of this Particular Case**

27. The Plaintiff plans to get an attorney for this case in the future if the Plaintiff can afford one.

28. Or, in the alternative, the Plaintiff believes he will be able to retain a contingency attorney for this case.

29. The Plaintiff alleges that he fully performed under the Parties' contract twice, first earning a fee of US $636,000, and then US $300,000 the second time.

30. Thus, the Plaintiff alleges that Mr. Pollock owes him $936,000 of base damages for breaching the Parties' contract.

31. Thus, the Plaintiff believes that his base damages ($936,000) far exceed the threshold ($75,000) for federal subject-matter jurisdiction.

**Underlying Facts & Background Context Prior to the Cerritos Village contract/funding deals**

32. Mr. Pollock and the Plaintiff are both longtime real estate developers.

33. The Plaintiff has a significant finance background as well, having raised hundreds of millions of dollars for clients.

34. The Plaintiff and Mr. Pollock signed a contract in 2021 (details below) for the Plaintiff to raise funds for Mr. Pollock's development project in Mexico called Cerritos Village, where Mr. Pollock was building 49 beach villas.

35. Rewinding to May 2014, Mr. Pollock had been indicted by a federal grand jury for allegedly re-routing funds from construction loans on two occasions from Banner Bank to an account at Northwest Bank (in the amount of $489,924 and $183,949).

36. The United States' Attorney's Office charged Mr. Pollock with bank fraud, financial fraud, and two counts of making false statements to a bank.

37. Mr. Pollock later pled guilty to making a false statement to a bank in a plea deal and was ordered to serve time and to pay restitution.

38. The Plaintiff mentions these details not to besmirch Mr. Pollock's reputation. Indeed, the Plaintiff thinks highly of Mr. Pollock and the two are long-time friends who were partners in a development deal.

39. They are simply mentioned in context. The Court might imagine that obtaining a bank construction loan for Mr. Pollock given the charges of bank fraud and making false statements to banks is more difficult than for most clients.

40. The Plaintiff has drafted this legal complaint to bring the Parties together to hopefully work out a fair settlement of the Plaintiff's issues.

**The contract**

41. In October 2021, The Plaintiff and Mr. Pollock signed a contract for the Plaintiff to raise US $5 million or more for Mr. Pollock's development project in Mexico called Cerritos Village, where Mr. Pollock was building 49 beach villas.

42. Mr. Pollock needed approximately US $22 million for the total infrastructure and vertical construction, but with US $5 million or more, the project would cash-flow.

43. In other words, with US $5 million or more, Pollock would have enough money for fill (dirt), infrastructure, and to build a subset of the units. As Mr. Pollock sold those units, he could put the revenue and profits into the rest of the 49 villas.

44. Mr. Pollock expected to make more than US $25 million on the project, but could not do it without funding.

45. The Parties and Capital Ideas (a DBA for Callister LLC, the Plaintiff's single-member LLC) signed a contract in October 2021 with the following language:

> Roger Pollock wishes to raise at least US $5 million to US $10 million in financing for his Mexican company's Cerritos Village project's phase 1, involving the building of 49 homes on the Northern end of Cerritos Beach, on a 14-acre beach parcel. The least expensive way to raise that capital (from an equity standpoint) will be 1st position mortgage debt, personally guaranteed by Mr. Pollock. Mr. Pollock's balance sheet may reduce the cost (interest rate) of a potential first mortgage. The parties agree on NCND. The ND part is that Wescott will keep Pollock's information confidential, except of course sharing necessary information with prospective investors to get to a closing. The NC part is a non-circumvent, just ensuring that if one of Wescott's investors funds Mr. Pollock's project, Capital Ideas (Wescott's company) will be paid. Capital Ideas is a dba for a newly formed entity in the UAE. Should Carl Wescott of Capital Ideas be successful in raising capital for Mr. Pollock, Pollock or his company will pay a consulting fee to Capital Ideas. For each US $1 million raised, US $60,000 will be paid to Capital Ideas. The consulting fee will be paid within two business days of the successful close of capital raised.

> The project actually needs US $15 million for full buildout. The only likely way that an investor will provide US $15 million is to break it into two cash-out refi tranches, though it may be possible to secure US $10 million+, or even the full US $15 million, as a construction loan with lender control and draws. Somewhere at or above US $5 million, Mr. Pollock would be able to put in the infrastructure and ten (10) or so houses, and cash-flow the whole project from there, so another option is one loan of US $5 million or more, as much as possible.

46. Capital Ideas has assigned its legal claims to the Plaintiff (Exhibit A).

**The Commercial Real Estate Lending Process: Commitment letter and Loan Commitment fee**

47. Real estate development is typically funding by construction loans secured by first mortgages.

48. There are equity-based solutions in the market, but the easiest and least dilutive solution to funding an approved for-profit housing development project is straight debt (100% debt financing).

49. Some lenders qualify borrowers on their financial strength; others use the equity in the land and project to secure a debt investment (secured by a first mortgage).

50. Regardless of the qualification and underwriting guidelines, after initial loan approval, the lender issues a commitment letter.

51. The commitment letter seeks to establish the specific terms and conditions of the proposed financing. It is an opportunity for the parties to ensure that they are in basic agreement with the loan amount, repayment terms, interest rate, collateral, guaranty requirements, and fundamental representations and covenants.

52. At that point, the lender charges a Loan Commitment fee ("the LC") because the lender wants to lock in the borrower and to protect themselves. The due diligence process and legal fees typically cost tens of thousands of dollars or more.

53. The lender does not want to invest those tens or hundreds of thousands to diligence, finalize, and prepare closing paperwork and loan documents only to have the borrower walk away from the deal, and thus charges the LC.

54. Many non-fund lenders also charge the LC because they are reserving capital for this particular investment which closes a month later. They don't begin earning interest on their monies until the loan closes, and thus the LC sometimes seeks to recapture some of the interest they otherwise would have charged on those reserved funds.

55. The LC letter and LC commitment fee (sometimes called something else) are a standard part of the commercial real estate funding process.

**Preparation**

56. To facilitate a construction loan secured by a first mortgage on the relevant Cerritos Village property, Mr. Pollock hired Dr. Rene Torres to conduct an As Developed appraisal of the Cerritos site.

57. Carl Wescott travelled to Mexico with Dr. Torres to help facilitate and to further understand the local market himself.

58. Dr. Torres delivered the final version of the appraisal on October 26th, 2021 (Exhibit B, first 4 pages of 216 page Torres appraisal).

**The Plaintiff fully performing, first of two times**

59. In December 2021, the Plaintiff found a potential investor, Guaranty Financial of Abu Dhabi ("GFAD"), that was willing to move forward with the Cerritos Village funding.

60. The Plaintiff disclosed Mr. Pollock's alleged bank fraud to GFAD up front, explaining that Mr. Pollock had served his time in federal prison camp, fully paid the Court-ordered restitution, and complied with all terms of his sentencing and release. Relatedly, Mr. Pollock has been clean and sober for many years at this point.

61. GFAD held a board of directors meeting on December 6th, 2021 to decide whether they could still move forward with a Cerritos Village funding, in light of those issues in Mr. Pollock's past. The board approved the notion.

62. The Plaintiff and Mr. Pollock submitted hundreds of pages of documents to GFAD, including this executive summary (Exhibit C).

63. In January 2022, GFAD offered US $10.6 million dollars, with a total cost of capital of 12.5%, 2.5% in regular interest payments, and an additional 10% to be recaptured and settled via lot release plan closings (Exhibit D).

64. GFAD wished to close in Abu Dhabi in February 2022.

65. However, Mr. Pollock did not wish to pay fees to a lender, even though that is a standard practice across banks and all other real estate development lenders.

66. Mr. Pollock declined the funding.

**The Plaintiff fully performing, second of two times**

67. In May 2022, the Plaintiff began the submittal process to another potential investor, the Global Capital Partners Fund ("GCPF") of New York. (https://gcpfund.com/).

68. On June 3rd, 2022, the Plaintiff provided the financial structuring to GCPF while also ensuring this investor would move forward with the proposed investment despite the issues in Mr. Pollock's past (Exhibit E)

69. In June 2022, GCPF provided a letter of intent and also a loan commitment with a loan commitment fee ("LC fee"), that guaranteed that Mr. Pollock would beneficially receive a US $5 million-dollar investment, structured as US $1.5 million for infrastructure and a US $3.5 million revolving line of credit.

70. If the loan did not close, Mr. Pollock would get his LC fee back.

71. However, Mr. Pollock insisted that GCPF was a "scam" and "fraud."

72. Mr. Pollock would not consider doing the simple due diligence to confirm that Global Capital Partners is real and not a "scam."

73. GCPF is a fund that has dispersed over US $2 billion in loans.

74. This is the second instance where the Plaintiff fully performed, bringing a ready, willing and able investor willing to fund the Cerritos Village development.

75. Once again, Mr. Pollock declined the funding.

76. Mr. Pollock has declined to pay the Plaintiff for the successful performance under the Parties' contract.

**Summary of base damages**

77. The Plaintiff worked on this project for over fifteen (15) months.

78. The Plaintiff fully performed as per the Parties' contract twice.

79. The first time, Mr. Pollock declined US $10.6 million, damaging the Plaintiff who would have made US $636,000.

80. The second time, Mr. Pollock declined US $5 million, damaging the Plaintiff who would have made US $300,000.

81. (The Plaintiff did receive US $2,000 from Mr. Pollock which partially defrayed his expenses).

82. From the Plaintiff's perspective, the Plaintiff is owed US $936,000 that are his alleged base damages.

83. From Mr. Pollock's perspective, every lender that charges fees is a scam and a fraud. Mr. Pollock does not believe he has any liability or needs to pay anything despite the Plaintiff twice fully performing as per the Parties' contract.

84. Thus, the parties have a controversy; the Plaintiff would like this controversy to be adjudicated based on its merits.

85. The Plaintiff has been damaged by Mr. Pollock's breaches.

86. The Plaintiff has been further damages by Mr. Pollock's refusal to pay the Plaintiff for having fulfilled the terms of the Parties' contract, and thus Mr. Pollock also owes foreseeable consequential damages (Exhibit F).

87. The Plaintiff, unfortunately, has been left with no choice but to file this legal complaint in hopes that justice can be served.

**Jury trial**

88. Under the Seventh Amendment to the United States Constitution, the Plaintiff has a right to a jury trial for his Constitutionally-protected petitioning rights. (Also, as per *Fed. R. Civ. P 38(b)*).

89. The Plaintiff hereby respectfully requests a jury trial on all issues raised herein, including all triable facts and issues related to his current causes of action and any facts, issues, requests, and/or causes of action that the Plaintiff or his future attorney may add within the timelines allowed by this Court.

**Count I – Breach of Contract**

90. The Plaintiff realleges paragraphs 1-89 as if fully set out herein.

91. The Plaintiff entered into a valid, signed binding written contract with Defendant Mr. Pollock.

92. The Plaintiff fully performed after quite significant work over fifteen (15) months by bringing ready, willing and able investors/lenders who offered to fund Pollock, twice.

93. Mr. Pollock breached by not accepting the money, and then not paying the Plaintiff.

94. The Plaintiff has been damaged as a result of the Defendant's breaches by losing US $936,000 in base damages.

95. All allegations and damages to be fully proven at jury trial.

WHEREFORE, PLAINTIFF PRAYS:

(a) As to Count I for all direct and consequential damages the Plaintiff incurred as a proximate result of the Defendant's breaches of contract;

(b) For reasonable compensation for the value of his time in representing himself while he cannot afford an attorney (*quantum meruit*);

(c) For reasonable future attorney's and paralegal fees and costs including administrative, filing, service, Court reporter, jury fees, travel costs and for all other reasonable costs of this action and;

(d) For such other and further relief as this Court deems just and proper.

RESPECTFULLY SUBMITTED

Carl A. Wescott, *pro se*
January 26th, 2023

**VERIFICATION**

I, Carl A. Wescott, under penalties provided by Oregon and Arizona law as well as the federal laws of the United States of America, certify that the facts set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

EXHIBIT A

# ASSIGNMENT OF CAPITAL IDEAS LEGAL CLAIMS

WHEREAS, Capital Ideas (a DBA for Callister, LLC) is owed monies by Roger Pollock related to the financing of Cerritos Village.

WHEREAS, Capital Ideas now needs to seek redress in the federal Courts to collect said monies

---

COMES NOW, Capital Ideas, of Scottsdale, Arizona, that hereby sets forth and agrees as follows:

1. For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Capital Ideas hereby assigns all legal right, title, and interest it may have in legal claims related to the Pollock financing of Cerritos Village.

2. Capital Ideas waives all right, title, claim and interest in these legal claims, whatever it or they may be, to Wescott free and clear of any claims of itself.

3. Wescott shall have all legal right and claim to the assigned legal claims. Wescott shall be afforded all legal rights and responsibilities pursuant to the legal claims as if he was personally in contract with Mr. Pollock.

4. Capital Ideas makes no warranties or representations regarding the legal claims, and Wescott enters this Assignment with full knowledge of the pertinent facts.

5. Each party has had the opportunity to seek the guidance of an attorney of their own choosing in entering this agreement.

6. In witness whereof, the Assignor Capital Ideas and the Assignee Carl Wescott have both executed this assignment on the January 2023 date set forth below. The assignment shall be effectuated when both parties have signed.

[signature]
Assignor Capital Ideas
January 25th, 2023

[signature]
Assignee Carl Wescott
January 25th, 2023

EXHIBIT B

APPRAISAL OF THE MARKET VALUE "AS IS" and "AS DEVELOPED"
of a 49 unit proposed residential development on a 12.3919 Acre Parcel of Land
known as Cerritos Beach, located in the
Municipality of La Paz, State of Baja California Sur, Republic of Mexico

Owner: Casa D'or, S. del R. V. de C. V.

PREPARED FOR
Casa D'or and/or assigns
Playa Cerritos, Hotel Hacienda Cerritos
Subdelegation of El Pescadero, Baja California Sur
Attention: Roger Millen Pollock

PREPARED BY

*René Torres, MBA, PhD*
*International Real Estate Specialist*
6036 Vanessa St. • Riverside California 92504
Tel: (714) 352-0909 • Cell: (949) 205-5473 • Fax: (916) 404-4324

As of September 11, 2021
(CORRECTED October 26, 2021)

Table of Contents

Summary of Salient Facts and Conclusions .... 4
Introduction .... 5
Hypothetical Conditions .... 6
Extraordinary Assumptions .... 6
Methodology .... 7
Applicability of Competency Rule .... 7
Scope of Work .... 8
Pertinent Definitions .... 9
Country/Regional/Area Data .... 10
- Republic of Mexico .... 10
- Government .... 14
- Economy .... 17
- Energy .... 20
- Communications .... 21
- Transportation .... 23
- Military .... 24
- History .... 25
- Prehistory and Pre-Columbian Civilizations .... 26
- The Major Pre-Columbian Civilizations .... 28
- The Aztec Empire (1325–1521 AD) .... 29
- The Spanish Conquest .... 30
- The Aftermath .... 31
- The Colonial Period (1521–1810) .... 32
- Mexican Independence and the 19th Century (1807–1910) .... 34
- After Independence (1821–1846) .... 35
- Political Developments In The South And North .... 35
- The Mexican-American War (1846–1848) .... 36
- The Struggle For Liberal Reform (1855–1872) .... 37
- The Mexican Revolution .... 38
- Mexico As A One-Party Democracy .... 39
- Mexico Under The PAN .... 40

Economic Survey of Latin America and the Caribbean 2020 .... 41
- General Trends .... 41
- Economic Policy .... 42
- The Main Variables .... 44

State of Baja California Sur .... 47
- History .... 47
- Facts And Figures .... 49
- Landmarks .... 50
- Baja California Sur Current Situation .... 50

Municipality of La Paz .... 52
Town of Todos Santos .... 54

History ..... 54
Contemporary Todos Santos ..... 55
Village of El Pescadero ..... 55
Neighborhood Data ..... 56
Property Description ..... 57
Effective Age and Economic Life ..... 62
History of the Property ..... 62
Highest and Best Use ..... 62
Cost Approach ..... 64
Income Approach ..... 64
Direct Sales Comparison Approach ..... 65
Estimation of Market Value "As Is" ..... 68
Subdivision Development Method ..... 68
Subdivision Development Plan ..... 69
Timing nd Costs for Approvals and Development ..... 69
Pricing Schedule ..... 69
Correlation of Asking Prices With Market ..... 70
Calculation of Absorption Rates ..... 70
Marketing and Related Holding Expenses ..... 70
Estimate of Taxes Over The Absorption Period ..... 71
Discussion Of Entrepreneurial and Contractor's Profit ..... 72
Determination of Appropriate Discount Rate ..... 72
Opinion of Reasonable Exposure Time Linked to the Value Opinion ..... 77
Reconciliation ..... 78
Addenda Contents ..... 79
Certification of Appraiser ..... 80
Underlying Assumptions and Conditions Appurtenant to Appraisal Report ..... 81
Pertinent Definitions ..... 83
Purchase Documents Lot 0468 ..... 85
Purchase Documents Lot 2732 ..... 103
Purchase Documents Lot 2736 ..... 125
Purchase Documents Lot 2739 ..... 134
Purchase Documents Lot 2743 ..... 166
Location Of Property (Aerial Photo) ..... 189
Plat Map ..... 190
Subject Property Photographs ..... 191
Comparable Sales/Listings Photographs and Location Maps ..... 195
Proposed Development Documents ..... 201
Rene Torres MBA PhD_Services and Qualifications ..... 209

## SUMMARY OF SALIENT FACTS AND CONCLUSIONS

The following is a summary of facts pertinent to the enclosed appraisal report.

| | |
|---|---|
| Property Appraised: | Appraisal of the Market Value "As Is" and "As Developed" of a 49 unit proposed residential development on a 12.3919 acre parcel of land known as Cerritos Beach, located in the Municipality of La Paz, State of Baja California Sur, Republic of Mexico |
| Effective Date of Appraisal: | September 11, 2021 |
| Land Area | 50,148.26 Square Meters<br>12.3919 Acres |
| Projected Marketing Period (Phase I): | 3-5 Years |
| Highest and Best Use (Vacant): | Resort Development |
| Highest and Best Use (as Improved): | Resort Development |
| Present Use: | Vacant Land |
| **Market Value as Is:** | **$6,400,000** |
| **Market Value as Developed:** | **$21,000,000** |

January 10th, 2021

Mr. Omar Khalid Ahmed
Member, Board of Directors
Guaranty Financial of Abu Dhabi
9th Floor, Aldar HQ
Behind Al Raha Mall
Abu Dhabi
United Arab Emirates
info@guarantyfinancials.com

Re: investment opportunity in "Cerritos Village"

Dear Mr. Ahmed:

Thank you for getting in touch with me concerning investment opportunities for Guaranty Financial of Abu Dhabi ("GFAD").

With this short letter and accompanying documents, I'm sharing information on the Cerritos Village development project for your review and consideration. Though we do not have a complete and formal business plan, I believe this is a worthy project and I am hoping this submission opens up a conversation that might lead to an investment. If the project is not of interest, I would still like to have a quick conversation with feedback on this opportunity, as well as some guidance on the optimal investment from your perspective.

I am merely a facilitator, helping my client, Mr. Roger Pollock, raise the needed capital for this project. The project is to build and then market and sell 49 homes on a 50,148 square meter beach parcel with 800 meters of beach/oceanfront. That parcel is on Cerritos Beach in Baja California Sur, north of Cabo San Lucas. Mr. Pollock has already invested significant capital, through his Mexican company, Casa D'or, S. del R. V. de C.V. ("Casa D'or, SA" or "Casa Dor"), to acquire the subject parcel and to entitle it for development. According to the attached appraisal, the value of the subject property is US $6.4 million (raw and undeveloped, based on market comparables). Using the As Developed By approach to valuation, which involves creating a net present value discounted cash flow analysis, Dr. Rene Torres has valued the parcel at US $21 million. Dr. Torres is a Harvard MBA/Ph.D. with 45 years of commercial real estate valuation experience – his credentials are also attached to this emailed letter.

We appreciate the opportunity to submit this information and these documents for your review. Below, please find information on Mr. Pollock and his company, the location of the project, the expected total project costs (US $22 million), and the expected duration of the project.

Mr. Roger Pollock and Casa Dor, part I

Roger Pollock is an experienced home builder, having built over 3000 homes in the metropolitan area of Portland, Oregon. His first building company (RMP Properties) was the largest homebuilding company in Oregon, until Mr. Pollock sold the company to D.R. Horton. D.R. Horton is a publicly-traded company and has been the largest homebuilder in the United States consistently for the last ~20 years.

Mr. Pollock was an avid surfer in his youth, and he discovered Cerritos Beach and fell in love with the area in the 1990s. Subsequently, Mr. Pollock purchased the entire north end of Cerritos Beach, which is about 30 minutes north of Cabo San Lucas and just south of the artist community of Todos Santos. Mr. Pollock's Mexican company, Casa D'Or, SA owned all that land, and Mr. Pollock subsequently built, from north to south:

The Hacienda Cerritos (https://www.facebook.com/haciendacerritos/)
The Cerritos Beach Club (now closed down so that Cerritos Village can be built)
The Cerritos Surf Colony (sold, now "Cerritos Surf Town" https://www.cerritossurftown.com/)
The Mayan Village (sold, https://www.facebook.com/EcoBungalowsCerritosMx/)

As part of the Cerritos Surf Colony, Mr. Pollock built approximately 40 homes and bungalows. As such, Mr. Pollock is not only the most experienced home builder in Oregon, but has built more homes on and around Cerritos Beach than any other builder or developer.

A background check or even web search will reveal that like many of us, Mr. Pollock had some challenges in his younger days. Issues that could affect the project are now all in the past. I sent an email with information on Mr. Pollock's guilty plea for alleged bank fraud and his paying restitution and serving his time. If you'd like more information on that, please advise, thank you.

Relatedly, Mr. Pollock has been clean and sober for over twenty years.

Current project status, maps, homes, and floor plans

The final two development permits needed for the project are the environmental permit and the fill permit. Mr. Pollock expects to have those this month (January) or next month (February 2022), at which point fill work and infrastructure work (electricity, water, septic and roads) could begin.

Maps, floor plans, and elevations for the houses are in the attached appraisal.

Please note that at the time of the appraisal, project costs were estimated. Mr. Pollock has since obtained bids for the construction project based on late 2021 prices, and thus, the spreadsheet of costs herein is correct, and the one in the appraisal is incorrect and too low.

Material risks including top five risks

We can have an entire discussion about risks, including hedging and mitigation strategies. Properly managed, these risks will not imperil the project, but rather have the potential to affect timing and profitability. Here are five significant material risks:

1) These homes are up-market from typical product in the area. They may take longer to sell, and they might have to be priced slightly lower to sell reasonably quickly.
2) Construction time will likely take longer than projected. It always does.
3) The area has hurricanes and tropical storms every year, which can and do have an impact.
4) The Dirham is pegged to the US dollar, but the Mexican peso fluctuates against the USD. Since real estate in Mexico is sold in US Dollars, the risk is mainly in potentially higher construction costs, as some of those costs are paid in pesos.
5) Availability of capital might impact the project. Luckily, GFAD can potentially assist in solving this issue.

Total project cost is US $22 million; total build-out cost is US $14.6 million of that

The total project cost is approximately US $22 million, as per the attached spreadsheet (last page).

However, the total build-out cost is only US ~$14.6 million. That consists of infrastructure and fill Costs of $2.357 million, and vertical construction costs of $12.25 million (49 homes of US $250k).

If it were possible to get the full build-out cost of US ~$14.6 million, the project would proceed at the fastest speed. However, we feel that that scenario poses higher risk for GFAD, even if broken out into two tranches of US $7.3 million.

Thus, we're modeling a possible GFAD investment of US $10.6 million, broken out into two tranches:

- In this potential scenario, GFAD would first loan US $5.3 million to Casa Dor, secured by a First Mortgage on the subject property, and personally guaranteed by Mr. Pollock. The mortgage would carry annual interest of 2.5%, but the total contractual return to GFAD would be an annual 10% of capital loaned/invested (inclusive of the interest paid).

  That would allow Casa Dor to put in infrastructure and build 12 of the 49 homes.

  Then, Casa Dor would sell some of those homes, and fully pay off GFAD and the mortgage with a total returned capital of principal + 10% ROI/annum.

- Then, the plan would be that GFAD would loan another US $5.3 million to Casa Dor, once again secured by a First Mortgage on the subject property, and personally guaranteed by Mr. Pollock. The mortgage would carry annual interest of 2.5%, but the total contractual return to GFAD would be an annual 10% of capital loaned/invested (inclusive of the interest paid).

  That would allow at least another 21 of the 49 homes to be built.

  Once again, Casa Dor would sell some of those homes, and fully pay off GFAD and the mortgage with a total returned capital of principal + 10% ROI/annum.

  The rest of the project easily cash-flows from there.

Expected Duration

The expected duration is dependent on many factors, primarily the agreed-upon investment structure. The minimum realistic duration to build out and sell the 49 homes will be 5 years, and likely longer. The project duration will be longer than the duration of the two capital infusions.

Further information on Mr. Pollock

Beyond the above information, Mr. Pollock has been a builder and real estate developer his entire Career (other than three years where he had a non-compete as part of his company sale). Mr. Pollock founded RMP Properties in 1990, Oregon's #1 home builder in 1995, 1996, 1997, and 1998, sold to publicly-traded DR Horton in 1998.

In 1997, RMP Properties was featured in the Inc magazine 500 fastest growing companies in the US, And Mr. Pollock was recognized in the Oregon Business Journal "40 under 40" (one of the 40 most Influential Oregonians under 40)

Mr. Pollock acquired Fine Art Marketing Company in 1999 and sold the company in 2002.

Mr. Pollock then founded Buena Vista Custom Homes in 2002, Oregon's fastest growing company in all categories in 2004. Buena Vista Custom homes was then the fastest growing home builder in the United States with over 1200% growth in 2005, and Mr. Pollock's new company was once again featured in Inc Magazine's Top 500 Fastest Growing Companies in the US.

Mr. Pollock was Oregon's #1 home builder in 2007, when he was Ernst and Young's runner-up Entrepreneur of the Year 2007

GFAD Six Page Application

Please find attached the GFAD six-page application. Please note that the company requesting funding is in Mexico, but Mr. Pollock lives in Oregon so we're using US addresses.

GFAD Six Page Application, Section B addition:

We are applying for this loan because while Mr. Pollock has significant equity in the land owned by his company Casa Dor, he does not have the capital needed to build the 49 houses on Cerritos Beach for sale.

Covering items not covered above or in the attached spreadsheet breakdown, we wish to repay by quarterly installments. What might work best is a 2-year Capital Repayment Holiday on the first expected loan, and a 1-year Capital Repayment Holiday, combined with a defined balloon payment each time one of the built homes is sold.

The financial model is pretty simple. Casa Dor doesn't own any significant building equipment and leases everything it needs, or that equipment is provided by building contractors, who are all contractors also in the sense of not being employees of Casa Dor. Essentially the entire building project is outsourced. Mr. Pollock has been building on Cerritos Beach for 15 years and knows all the tradesmen and whose best and reliable.

Mr. Pollock has bought the land and owns it free and clear through Casa Dor, SA. Casa Dor has no debt. There are no bank loans or grants. We are contributing the land, which is now largely entitled, and the expertise and management/oversight to build the 49 homes to quality and then to sell them. We are asking GFAD for the entire rest of the monies needed for infrastructure and home building.

---

I hope the information herein and in the attachments is clear.

Mr. Pollock and I are interested to hear your thoughts on the information shared with you so far, and how we may best facilitate any potential next steps.

Please note that we would like to go through your First Appraisal Reading step and then have a phone call with you. Right after that phone call Mr. Pollock can supply his passport copy or other identification so you can do your research to confirm he is not involved in criminal activities including money laundering. When the project is ready to fund, we'll provide banking/wiring information, if that is amenable to you.

Thank you for your time and consideration.

Carl A. Wescott
Capital Ideas
+1 936 937 2688 (cell phone)
Dubai resident who is living in the Movenpick Hotel Bur Dubai (though temporarily in the US)

**Cerritos Village**

| **Total Project Expenditures** | | |
|---|---|---|
| Infrastructure Costs | $ | 1,800,000 |
| Fill | $ | 557,000 |
| Direct Construction Costs, Units | $ | 12,250,000 |
| Sales Commissions (6%) | $ | 2,519,010 |
| Transfer Taxes (2%) | $ | 839,670 |
| Marketing Expenses (2%) | $ | 839,670 |
| Property Taxes | $ | 2,871 |
| Permits and Fees | $ | 510,500 |
| Administrative/Overhead | $ | 720,000 |
| Contractor's Profit (10%) | $ | 900,604 |
| Contingencies/Misc. (10%) | $ | 1,068,188 |
| **Total Project Expenditures** | $ | 22,007,513 |

 Carl Wescott <carlwescott2020@gmail.com>

## Re: Confirm Receipt of the Attached GFAD Due Diligence Report and MOU

**info@guarantyfinancials.com** <info@guarantyfinancials.com>
To: Carl Wescott <carlwescott2020@gmail.com>

Mon, Jan 31, 2022 at 5:23 AM

Attention Roger Pollock ,

First I will say a very big congratulations to you.

This is to inform you that the Guaranty Financial of Abu Dhabi agreed to collaborate with the CASA DOR, SA DE V through project funding. Having reviewed the Business Plan and all documents as presented, we are interested to move forward in establishing a collaboration with CASA DOR, SA DE V in the funding of this project which we consider a viable venture. In my previous email to you, I did inform you that the Guaranty Financial of Abu Dhabi only fund projects with a 2.5% interest per annul throughout the duration of the loan, and our funding consideration to this project will be based on this form of funding.

Attached is the Guaranty Financial of Abu Dhabi MOU, Electronic Due Diligence Report. Kindly sign only the Electronic Due Diligence report while the MOU will be signed upon your arrival in Dubai to meet our legal Financial consortium/Loan Facilitator for Contract Legalization, Notarization and all Documents Registration/Endorsement.

NOTE: You are expected to come alongside with the below requirements:

--- Second Party's Documents (Statement of Account & Company Certificate of Incorporation)
--- Valid ID such as International Passport Copy or A Driver's License
--- A Letter written with the Second party's Company Letterhead stating in Capital Letter Second Party's Company's Account details and approving it to be the beneficiary account for the wire of the Investment funds of $10,600,000
--- Contract Legalization, Notarization and Beneficiary Documents Registration/Endorsement fee of $38,900.

All Documentation Costs, Fees $38,900), Interest/ROI and Unpaid Principal amount of $10,600,000 as aforementioned shall be made available to the Investor's Fund Manager/Loan Facilitator for Facilitation of Contract Legalization.

CASA DOR, SA DE V is required to provide to us the Legalized MOU, Notarization under the supervision of our Loan Facilitator Attoumani Said of Al Anfal Pms Advocates & Legal Consultancy. This is because the central bank of the UAE in line with the ruling CCPID laws of the United Arab Emirates International Trades and Investment Relations for external commercial investment "cannot" authorize the direct transfer of investment funds to companies outside the U.A.E unless the company has a business operations within the U.A.E as the ruling government only supports investments with companies and business entities within this region. The legalized credit contract is what confirms your

business operations within this territory. This is the function of the contract legalization, notarization and documents endorsement.

Please note that you will spend 2 to 3 working days in UAE, below is the meeting schedule and If ATTOUMANI SAID favors you, it might last only for 3 days.

*** First meeting 10th February , 2022

Meeting Venue: Al Anfal Pms Advocates & Legal Consultancy Office in Dubai, UAE
Meeting Agenda: Contract Legalization, Notarization and Documents Registration/Endorsement
Meeting person: Attoumani Said and his team, is our Loan Facilitator/legal consortium who assist our clients to legalize, notarize the contract agreement without any delay from the government offices.

*** Second meeting 11th February , 2022

Meeting Venue: Guaranty Financial of Abu Dhabi Office in Abu Dhabi.
Meeting Agenda: Table meeting with the Guaranty Financial of Abu Dhabi board of directors and Final signatory. (The Guaranty Financial of Abu Dhabi Board of Directors will be presenting wire confirmation slip and Anti Money Laundering Certificate License to the project owner)

P.S. Please confirm your availability for the meeting and if you have any questions concerning your deal, do not hesitate to contact us.

Sincere Regards

Mohammad El Ghandour
CEO

Guaranty Financial of Abu Dhabi
9th Floor, Aldar HQ Behind
Al Raha Mall Abu Dhabi,
United Arab Emirates
Tel:+971 559094179
Email: info@guarantyfinancials.com
website: www.guarantyfinancials.com

June 3rd, 2022

Mr. Gregg Pierce and Mr. Richard Charles
Administrator Associate to Executive Managing Director
Global Capital Partners Fund LLC
555 Fifth Avenue, Suite 1501, NY NY 10017
rcharles@gcpfund.com (via email)

Dear Mr. Pierce:

Thanks for your time on our call last week.

Continuing in our process towards the term sheet, contract, and funding, please find attached the parts of the application that are relevant to our requested loan.

Before we go any further, there's one important thing to bring up, which I referred to when I stated that "a background check or even web search will reveal that like many of us, Mr. Pollock had some challenges in his younger days."

Specifically, Mr. Pollock was indicted for alleged bank fraud eight years ago, and accepted a plea-bargain, pleading that he had made a false statement to a bank. Pollock served some time in federal prison camp, paid his fine, and has paid his debt to society. That's now all in the past.

Here is a relevant article: https://pamplinmedia.com/lor/48-news/267755-142250-former-real-estate-developer-roger-pollock-pleads-guilty-to-bank-fraud

The other thing to draw your attention to is that I screwed up in the previous executive summary in listing Casa D'Or, SA as the owner of the subject parcel. Casa D'Or, SA used to be the owner, and the parcel has since been transferred into Cerritos Beach Resorts and Spa, SA. Please accept my apology for the error.

The important details of the parcel are still true (size, value, owned free and clear, and now entitled for the development).

Now, on to the details of the Loan Application.

Since most of the Loan Application (e.g., income) is not relevant to our hard money development/construction loan request, I'm reproducing the important parts of the Loan Application herein.

We incorporate by reference the Executive Summary, Dr. Torres' qualifications, and the Subject Parcel Appraisal.

---

Upon reflection, some modeling, and considering your kind advice in our call last week, we are requesting a US $4.9 million loan, with a waterfalled lot release plan and payback. The GCP Fund would receive a first mortgage (*hipoteca*) for security. Mr. Pollock is willing to PG.

We are happy to pay 12% interest and points and look forward to your term sheet/quote and more detailed terms, so that we can move to contract.

As you know, Mr. Pollock is developing 49 villas on the beach. The full direct buildout costs of the project are estimated to be just under US $11.5 million:

**Cerritos Village**

| **Capital Needed for Full Buildout** | |
|---|---|
| Infrastructure Costs | $ 1,400,000 |
| Direct Construction Costs, Units | $ 10,045,000 |
| | $ 11,445,000 |

For our uses, the US $4.9 million allows us to complete our infrastructure and amenities (fill, roads and curbs, electric and water infrastructure, retaining wall, and pool)

| **Uses of US $4.9 million** | |
|---|---|
| Infrastructure Costs | **$ 1,400,000** |
| (Fill and retaining wall | $ 700,000) |
| (Roads, curbs, and utilities | $ 400,000) |
| (Pool and pool area | $ 300,000) |
| Building 17 villas | **$ 3,485,000** |
| | **$ 4,885,000** |

We propose a lot release plan paying back $100k per sold villa.

The attached financial model is unlevered but shows the profitability of this project. I would be happy to revise the model if it is helpful, showing the infusion of capital, a speedup of building the first 17 villas, and the payback period, but would want your terms to do so properly.

As you know, costs are rising rapidly in our current inflationary macroenvironment, especially with the war pushing up energy, transportation, and raw material costs. Thus, we will need to rebid the project and get updated numbers/bids. We have been hesitant to do that until we had funding in hand.

Borrower: Cerritos Beach Resorts and Spa, SA, a Mexican Sociedad Anonima (formed in 2008)
Address: 11724 SW Riverwood Rd Portland OR 97219
Phone number: +1 503 964 8222 (Roger Pollock cell phone)

Nature of Business and Purpose of Loan: Cerritos Beach Resorts and Spa, SA ("CBRS") is a single-purpose entity, owns no assets, and has had no relevant income. CBRS is developing 49 villas on Cerritos Beach and will exit/cash out by selling those 49 villas. The purpose of the GCP Fund loan is to bring in fill, put in infrastructure, and build 18 of the 49 villas, as detailed above (best guess before re-bidding the project).

Mr. Pollock has a net worth of approximately US $38 million. Almost all the assets are in Mexico, including the Hacienda Cerritos, which is owned by Casa D'Or, SA, and receivables based on the sale of a development project. He owns 99% of Cerritos Beach Resorts and Spa, SA.

We would be happy to supply any further documentation desired, including the corporate documents for Cerritos Beach Resorts and Spa, SA.

Page Two Checkboxes:

Clarifying information in the checkboxes on page 2 of the Loan Application. Mr. Pollock is not a Defendant in any lawsuit, but is the Plaintiff suing a former employee.

I submitted applications to other sources of capital in 2021 while we were still awaiting our full permits. Those applications turned out to be too early in our process, as the permitting process dragged into May 2022, and thus we shut down that process and decided to start over once we were fully entitled.

Now that we received our permits as of last week, since the market is red-hot, we've decided to go hard money because the speed of funding is important to us, attempting to capture this market opportunity and hopefully still sell product quickly at this market peak.

Global Capital is the only fund we've submitted to in which we have an active file, and thus, if you'll just give us a good offer/term sheet, we plan to sign your contract and fund/close with you.

Thank you for your time and consideration.

Carl A. Wescott
Capital Ideas
+1 936 937 2688 (cell phone)

January 26th, 2023



Mr. Roger Millen Pollock
11724 S. Riverwood Road
Portland, OR 97219

Dear Mr. Pollock:

I've signed a contract (with a partner) to acquire a gold mine with $340 million of alluvial gold deposit, which can be extracted at around 80% margin (in other words, it will cost well under $68 million to pull that out and sell it, with a future profit of $272 million, half of which will be my company's, pre-tax).

It will take at least 13 years to extract all the known alluvial gold.

As set out in my legal complaint, you owe me approximately $936,000 of base damages, which would more than cover the acquisition of this mine ($735,000 payment to get control, rest of the payments can be paid out of mine cash flow.  I can restructure that to be a first payment of $300k, if needed).

---

As you are aware, I have sustained direct, or general damages from your breach of contract in the amount of over $300k, plus prejudgment interest.  You have, thus far, resisted addressing this situation.  (I am not sure I would be awarded both the $636k and $300k, so I'm using the smallest number to be conservative)

Your Breach of Contract brings forseeable consequential damages.

You should be aware of statutory law relating to special damages, sometimes called "consequential damages" codified in part at (for California) CCC 3300 and explained in detail in *Arntz Contracting Co. v. Stm Paul Fire & Marine Co.* (1996) 47 Cal.App.4th 464, 489. Specifically, if a breaching party is made aware of damages arising out of collateral transactions, flowing from the breach, then that party may be liable for lost profits arising out of such collateral transactions.

The same laws and settled law apply in Oregon.

The purpose of this communication is to place you on notice that your failure to pay at least $300,000 of what you owe will imperil a collateral contract in which my anticipated profits are $136 million over time and have a Net Present Value of perhaps one quarter that, or $39 million.  Should you choose not to pay amounts contractually due, under California and Oregon law it is highly likely that you will be liable for this amount as special or consequential damages.

Of course, I am doing my best to mitigate.

I respectfully suggest that it would be prudent to eliminate your exposure to my lost profits by promptly settling at least $300,000 of your contractual obligation and I am prepared to engage with you promptly and efficiently for the purpose of doing so.

Thank you for your consideration of these important points which are intended to mitigate my losses and avert a significant enhancement to your contractual liability.

---

I also told you about my gold trading opportunities where I can more than double my money with each gold trade, and can likely do one of those every week or two.

So even $50k or $100k right now would help me as I would turn those sums into much larger amounts (as I will later demonstrate and prove in Court).

---

Please work out paying me some money soon in the near future, so I can do gold trades and complete this acquisition and enjoy the benefit of the bargain.

Thank you!

<signed> *Carl A. Wescott*

Carl A. Wescott
8210 E. via de La Escuela
Scottsdale, AZ 85258
+1 936 937 2688